This is 25-4050, Alpine Securities Corporation v. National Securities Clearing Corporation. And for the appellant, Ms. Fritz. Good morning, Your Honors. Miranda Fritz. I represent Alpine. I will hopefully be reserving two minutes for rebuttal. This case presents a critical question concerning whether the Constitution permits significant government power to be delegated to and exercised by private entities that disclaim any obligation to abide by the Constitution, by its separation of powers concepts, or by the due process provisions of the Constitution. This implicates for this Court two related issues. The first is the private non-delegation doctrine. And that is the doctrine that, from Carter Cole on, basically generally forbid government power being placed in the hands of private citizens. And as of last year, the Supreme Court has told us that that doctrine is very much alive and well. In the Consumers Research case, the Court stated, in the leading case of Carter v. Carter Cole, this Court struck down a statute authorizing certain coal producers to set maximum hours and minimum wages for the rest of the industry. We explain that the statute involved delegation in its most obnoxious form, because it was made to private persons whose interests are often adverse to the interests of others. Alongside that doctrine is the following question. Where government power is held by private entities or individuals, can they evade the  Can they ignore constitutional constraints and protections? On that case, we've gotten very thoughtful guidance from Justice Gorsuch, who wrote the opinion in U.S. v. Ackerman. U.S. v. Ackerman is an extraordinarily thoughtful analysis of whether a private entity is functioning in a way that subjects it to being considered a government entity on the one hand, or a government agent on the other hand. So those are the issues that are before this Court. Let's jump into the statutory scheme, because ultimately this case revolves around the creation and operation of the clearinghouses, right? It does. There's a real contrast between the creation here, the statutory scheme here, versus consumers' research that I would really ask you to bear in mind. Consumers' research emphasized the fact that there were very clear congressional statements of principle to guide the FCC, and that the FCC then established the rule or formula that was at issue in that case. Going to the non-delegation issue, the question is whether the agency ultimately has meaningful supervisory role or decision-making power with respect to the, I'm going to call the subcontractor if you want to refer to the clearinghouses in that way. And the defendants, the FCC in particular, point to 78QD1 as basically trumping your arguments that the earlier parts of the scheme delegate too much power, because under that provision they claim, the FCC can ultimately disavow any clearinghouse rule that is not in the public interest or is otherwise not in furtherance of the purposes of the act. What's the flaw in their response to your non-delegation argument? Your Honor, I would say a couple of things. First of all, yes, in Horstman's, in Oklahoma, and even in the Alpine case from the D.C. Circuit, there has been a focus on this issue of the broadest sort of agency oversight and the extent to which it can amend or modify rules of the private entity. And yes, that has been a factor that has been very much a focus of the decisions. I would suggest that the Supreme Court in consumers' research really looks much more specifically at who the real decision-maker is. I think it is a more thoughtful analysis. Having said that, here, obviously in Horstman's and in Oklahoma, they focused on the fact that the agency could amend or modify the rules of the private entity. Well, here we are, and we have a statute that says, oh, no, you can't. Very specifically, that enables the SEC to amend or modify SRO rules except for the registered clearing agency. Now, that speaks volumes, right? So then they respond by saying, well, there's a general provision over here that would allow us broadly to enact rules that would affect the operation. And what's wrong with that? What's wrong with it is when you put that provision saying you can't amend, revoke, or modify, that means something. You can't circumvent it by then figuring out another way to amend, revoke, or modify the clearing agency's rules. And you would rely on consumers' research for that? Or free enterprise? What's your best case for that interpretation? I'm not saying that that particular proviso has appeared. In the other cases that we have dealt with, there has either been the ability to amend, modify, and revoke, or not. And that's really been dispositive. In this case, we know they do not have that ability. And so, arguably, both the Fifth and Sixth Circuits would say that's not sufficient oversight. They don't have the ability to, as the courts have put it, amend or rewrite the rules. To the contrary, all they have is consistency review, another focus of the Fifth and Sixth Circuits. And so what we have here is an agency that cannot, cannot amend or rewrite the rules, nor may it use other sort of broader provisions to try to accomplish exactly that result. And so what we have is HISA 1, Horstman's 1, where that was held to be a private, non-delegation doctrine because of lack of oversight. But as we've moved forward, consumers' research was so focused on who makes a decision and whether private individuals and entities have been given that enormous power. Bear in mind, what we're dealing with here is Congress said there should be established, the SEC should establish a national market system. The SEC then takes that enormous power conferred on them by Congress and hands it off to a private entity that is in every respect the echo of what happened in Carter Cole. Bear in mind, these individuals consist of J.P. Morgan, Goldman Sachs. The board of DTC is purely private interests operating to control access to the market. In the broadest sense, that has long been considered impermissible and for very good reason. The constitutional, the governmental power that we allow our government to deploy is intertwined with protections that are built into the system. Accountability on the one hand to the president, to the executive due process on the other hand. And we have argued in our briefs, and again, I think Justice Gorsuch in his Ackerman opinion, does an excellent job of discussing the fact that you can't rip the power away from those protections. We are subject to a private entity that thinks that having a dispute adjudicated by its own board is perfectly fair. Well, but you now have the opportunity to appeal that to the SEC, which will conduct its review of the proceedings below. Well, I would point out that... Just because there's a board on the first step doesn't mean that there's... It's impossible to make a bias claim to the SEC, if you wish, and demonstrate why there was bias in this case. Bear in mind the SEC's review of DTC action is limited to whether it acted consistent with its rules. It is an extremely narrow review. I would also point out that in the brief that was filed in this case, there was, I think, a striking effort by DTC to really paint Alpine in the worst possible light. Six pages were devoted in the brief to arguing the underlying case with lots and lots of vitriol thrown in. On the very first page of their... Setting that aside, you successfully obtained a stay of enforcement of that. Can't you make these arguments to the SEC that the adjudication was biased? No. I mean, this sort of goes to Thunder Basin factors and whether this due process issue is properly considered. Our argument is, under Axon, the Supreme Court specifically said issues about an illegitimate decision maker are among those that don't require that you go through the administrative appeal system. Well, you can appeal the decision the SEC makes to a circuit court. Eventually, yes. But please understand, and the D.C. Circuit in the Alpine case truly focused on this. The damage that has already been done at that point cannot be undone. It is only by virtue of some very unusual circumstances that Alpine stands before you now still able to present these arguments to the court. But as to you, as to Alpine, the damage can be undone by a victory at the SEC or the circuit court. I would argue the damage can never be undone. We've gone through years of this. We have had to go through investigation, prosecution... That's true of any litigation. But, again, the D.C. Circuit and other courts have looked at that and said where they have the unfettered authority to do this after the fact review is not good enough. As they said in Horstman's, the horse is already out of the barn. Sorry. I would point out that the SEC has issued a further decision in our case. And I would just point out that it is DTC that they take issue with in terms of whether they're abiding by any cognizable rules. I would like to reserve time. You may. Thank you. I'll give you a few more minutes since we took your time. All right. I think you are splitting. Yes, Your Honor. Going first is Mr. Harris. Yes. You may proceed. Thank you, Your Honor. May it please the Court, my name is Mark Harris. And I represent the National Securities Clearing Corporation, the Depository Trust Company, and the Depository Trust and Clearing Corporation. I'm going to be splitting, as Your Honor said, my time with counsel for the government. Do you want 50-50? Sure, Your Honor. Since the founding, the securities industry in this country has been self-regulating, meaning that it sets and enforces its own rules, including the rules for membership. And clearing agencies have always been private entities, as they are now. Alpine is effectively arguing that NSCC should be treated for constitutional purposes as if it's part of the federal government, or if it's not, that it's been unconstitutionally delegated federal power. That position violates longstanding precedent, and it's wrong. Let me go through the arguments that I think you just heard from Ms. Fritz. So the main argument, I take it from them, concerns the private non-delegation doctrine. There are two branches of that argument. One of them is rulemaking. The other one is enforcement power. And as Judge Timkovitz said, the standard really from the Carter-Cole case, from the Sunshine-Athrokite case, the Atkins case, is whether or not the agency is exercising, I think the language of the cases was surveillance and authority, what we would call supervision and oversight. There's no question with regard to rulemaking that there was supervision and oversight. The SEC approved these rules. In fact, the SEC basically invited NSCC a few years earlier to modernize their capital requirements. In terms of what the SEC did in terms of approving its rules, there were two powers that the SEC employed. The first one is consistency review. What you heard from my friend on the other side is that consistency review is somehow inadequate. The Oklahoma 2 case from the Sixth Circuit, which just came down, that was the decision on remand from the Supreme Court after the consumers case, I think has a very, very powerful way to put this. Judge Sutton, speaking for the court, said that to criticize consistency review is to search for clouds on a cloudless day. There's really not much that could be better than consistent review. The test is whether or not what the SRO, the clearing agency, did is consistent with its rules and consistent with the statute. That's pretty much the whole standard. There's not much more that one could ask for. The argument is that if it's consistent, the agency has to approve the rule, and the statute further takes away the power to modify or abrogate the rule, right? So that looks like the minimus oversight. It's minimal or inadequate oversight is what Ms. Fritsch said. So that's the second power, Your Honor, which you referred to earlier, which is that the SEC has the power to prescribe rules and regulations for the clearing agency, even though it doesn't modify the rules directly. In the case of a clearing agency, what it can do is it can tell the clearing agency this is how you have to operate. And that includes your 78Q argument? Exactly, Your Honor, yes. And, in fact, that is what was used here in terms of SEC's original invitation to the agency, to the SRO, to the clearing agency, to issue the E&C rule. In fact, I would argue, if anything, that this is a reflection. The fact that the standard is different is a reflection of the fact that clearing agencies are private organizations. If it were closer to a governmental organization, closer to being an arm of the government, so to speak, maybe one would expect that there would be additional power to go modify those rules directly. The fact that there's some distance and that what the SEC does is, says, this is how we're going to tell you to operate, this is part of regulation, this is what you need to do, but doesn't modify the rules directly, it gets to the same result. It's a reflection of the fact that the clearing agencies are themselves private. But there's no reason to think that it can't do every single thing that it would be accomplished if it was direct modification of the rules. It seems like an odd way to structure the, you know, the setup because they can't, it seems like they can't modify a rule directly. It seems like, you know, if it's consistent with existing policy, they have to approve it. If the SEC thinks the existing policy is inadequate or needs to be changed, they have to then later, instead of dealing directly with the rule, they have to allow the rule to go into effect and then have a notice and comment proceeding to then change the basis of the existing rule to make it inconsistent with current, or you know, the new SEC policy. Right, I don't think this signifies that there was, on Congress's part, really any different attitude toward the leeway to be given to the clearing agency. I think it's a function of the fact that the statutes were passed at different times. The Maloney Act was passed in the 30s and it did not cover clearing agencies. Clearing agencies weren't added to the securities laws until 40, 50 years later. And at that point, it just adopted a different mechanism. The 78Q mechanism is just as powerful. And we gave examples in our brief of situations where the SEC has done exactly this. The SEC has said, go issue rules that would go do the following. There's no argument that the other side has been able to. Have they ever used that 78Q to modify or rescind a clearing house adopted rule? I'm not aware that it's happened. Part of the reason why we would argue is that most of what the clearing agency is doing, especially in this regard, it's really its own membership rules. What we're talking about here are its own membership rules. It's acting as a private organization deciding who can belong to it and who can't. And there's regulation. I think what we're hearing from the Alpine side is some kind of argument that regulation somehow turns something into a governmental actor. It's quite the opposite of that. The fact that there's regulation of the clearing agencies is a reflection of the fact that the clearing agencies are not part of the government. They're private organizations. All that Congress did – I know that's why we have a private non-delegation doctrine, right? Yes. And I know the SEC will tell me if they've used the power before, but if not, it seems odd that if the SEC has this power to micromanage, manage the clearing houses, that they've never exercised it. I'm not sure there's ever been occasion or a need to do it. For example, as I mentioned earlier, this very rule, the EMC rule, happened because in 2016 the SEC directed the clearing agencies to consider whether or not higher capital requirements and other things would be needed. And, in fact, in the rule that the EMC rule itself, which the clearing agency proposed, it cited that direction from the SEC as the basis for what it was doing, and then it was approved. So there's just no evidence here whatsoever that if the SEC didn't approve, if one goes through the SEC's actual approval of this EMC rule, there's nothing in that long discussion. It's not as if the SEC just says, well, this is consistent. We can't do anything about it. We wish it were different. It's a long, detailed analysis that explains how all of it is consistent, not only with the SEC, with the Securities Act, but also with the SEC's own regulations. I think what Judge Sutton points out is that with a statute that's been around for a long time and with a robust system of regulation as we have in the securities field, it would be very easy for the SEC, if it wanted to, to have all kinds of regulations that it could pass covering certain areas and certain activities. There's no danger here that this is a runaway clearing agency doing what it wants to do, and the SEC has to just shrug and say, well, we have to put up with this until we can get around to fixing it. That's not been the relationship. There's no evidence of that whatsoever. I want to quickly address, because I think counsel on the other side sort of mixed together the enforcement side of this with the rulemaking side, because I thought that their principal contention was not really about the rulemaking but was that they were getting essentially the death penalty imposed against them, a cease to act, and there had been no governmental review of that. As I think the panel mentioned earlier, the fact that there's now been the SEC's agreed to review, to grant the stay, and there will be appeal. Although if they hadn't gotten the stay, they'd be out of business. It's the death penalty. You've got a reprieve of execution. But I think the point here is that they're bringing an as-applied challenge. Their whole complaint, the whole essence of their complaint was there's a sanction that will be imposed against us, and the government played no role in it. That's obviously not true anymore. The government will play a role in it. The SEC will review this. They have the stay, so they don't have any ground really then to complain at all. It's effectively moot, that argument. I know, but their argument's more to the structural process here, not just the way it's been applied to them. And I know it's an as-applied claim, but their due process claim, isn't it a structural attack on the board's hearing process? I think it's only a structural attack. It's only attack at all on the composition of the panel, things like that. And as Your Honor mentioned, they have a chance to brief that. They already have briefed that to the SEC. The SEC's completely capable of addressing that. I think I— You wanted to share your time. Yes, I did. Yes, thank you, Your Honor. Always risky. All right, Ms. Tan. I'll give you a few more minutes. Thank you. Good morning, Your Honors, and may it please the Court. Caroline Tan for the United States. And I wanted to start with the rulemaking provisions since it was the focus of your questioning earlier. Move the mic a little bit. We're getting some feedback here. Is that better? Is that better? Keep going. Okay, okay. I guess two fundamental points on this aspect. The first is that nothing has actually happened to Alpine, and that's because of the SEC's say-so. The clearing agencies initially rendered a decision that said, we don't want to provide these commercial services to you anymore. We think you violated our rules. If the clearing agencies were the ones really in charge, they would have stopped providing these services over a year ago. But that hasn't happened, and that's because of the SEC's say-so. We're still getting some feedback. Maybe lower the mic a little. Okay. Is this better? Yeah, I think you're too close to it. Okay. I apologize, Your Honors. Thank you. And slow down just a little. Okay. I'll give you extra time. Thank you. The point I really wanted to make was that nothing has happened to Alpine because of the SEC's say-so, and with respect to the private non-delegation doctrine, that's what ultimately matters. The SEC review itself has also been very robust. When they ordered the full stay, they ordered six additional questions for the parties to brief about the underlying dispute in this case and the extent to which the clearing companies had adequate capital during the relevant period. With respect to the rulemaking provisions, 78Q1, there are two points there that I think are really important. The first is that Alpine has not disputed the legitimacy of this rule. Their entire dispute is only about the application of that rule to them, whether they should meet this higher threshold or this lower threshold. So there's no actual argument in this case about the way in which the SEC approved this particular rule. The second is that 78Q1 is just as sweeping in all constitutionally material respects as the add, to, modify, and delete language that Alpine focuses a lot of their argument on. Has 78Q ever been used to modify or rescind a clearinghouse rule? Yes, Your Honor. I mean, in pages 41 of the clearing agency's brief, they cite to a number of examples in which the SEC has used its plenary authority over, you know, clearing agencies to order certain changes to the way the clearing agencies are undergoing their practice. And the text of this provision is just as sweeping. You know, it says, no clearing agency shall engage in any activity in contravention of such rules and regulations as the commission may prescribe. That ultimately means that the SEC is the one that gets to decide which rules govern this aspect of the securities industry. And for purposes of the private non-delegation doctrine, that's all that matters. So even if the SEC can't modify the rule directly, they can order modification. They can fundamentally be the ones that say, you know, this is how we think policy in this space should be implemented. What if the commissioners thought, ah, the $10 million threshold's too high. We want it $5 million. How would they accomplish that? Well, that's actually before the agency right now. That's part of the order of, you know, the grants of the full state. They've said, we would like more information about this particular rule, about the amount of capital that Alpine had in its reserves during the relevant period and the extent to which, you know, the higher threshold or the lower threshold should apply to Alpine. So that's something the commission's actively reviewing at this moment. I believe Alpine submitted its brief to the SEC last week. Anyway, I'm not sure you answered my question. The $10 million was consistent with policy according to the SEC when they reviewed the rule. Let's say the SEC now wants to, you know, after complaints, they want to reduce it to $5 million. Alpine has hired good lobbyists and they want to lower it to $5 million. How does that happen? I think the administrative dispute would be where the parties litigate which rule should apply to them and whether Alpine, you know, had sufficiently met the requirements to change it. Can the SEC order the clearinghouses to promulgate a rule that lowers the dollar threshold? The SEC can promulgate its own rule that does that directly. But it can't tell the clearinghouse to do so. I think the SEC could under 78Q1. They could say you have this rule. We would like you to change it. We order you to change it. And what if they did not? What if the clearing agencies deny it? Do you have any power to force them to promulgate a rule? The SEC has a number of, you know, supervisory powers over the clearing agency, including that they can deregister clearing agencies if they so choose. But I think under 78Q1, the SEC can promulgate a rule that says we actually think, you know, this is the way the capital requirements. So if you clear away all the debris on the delegation issue, the answer is 78Q is the trump card that eviscerates all of their claims. That's correct, Your Honor. And I think, you know, since we're speaking about trump cards, the other one is that nothing has actually happened to Alpine in this case because of the SEC say so. To the extent they continue to dispute the disciplinary procedures or the disciplinary sort of process at issue here, they have gotten all of the government review that is consistent with the private non-delegation doctrine. Isn't it true they would have gone out of business but for your sake? I'm not sure we necessarily would agree with that. We do think there are some distinctions. But the SEC has said, you know, we think you've sufficiently demonstrated your upper heart. We're going to take a closer look and we're going to both grant you the administrative stay, which has been in place since the inception of this particular litigation, and also now full stay of reviewing the underlying merits. If I could just say one thing. You can go up to three minutes. Okay. Thank you. Thank you, Your Honor. Because there was some discussion about the bias claim, I did want to take a few moments to talk about that. Appellant's complaint themselves only pleads this particular claim as one about the vagueness or the propriety of the clearing agency's rules. And so the way they have brought this claim has been one about the way in which the disciplinary procedure proceeded and has also focused on the application of the Fair Procedure Requirement and Exchange Act. Those are all the kinds of things for which the SEC's expertise can be brought to bear. Those finance claims have actually been presented to the SEC in the current administrative proceeding. And should Appellant still be aggrieved by the end of the administrative process, they can seek judicial review in the Court of Appeals. All this just shows you why the district court correctly dismissed that claim for lack of jurisdiction and correctly applied the Fender-Basin factors. I'm happy to answer any other questions the panel may have, but if not, we ask that you affirm. Okay. Thank you, Counsel. Thank you. And, Lisa, could you give Ms. Fritz three minutes? Thank you so much. I'd like to respond to Your Honor's question, and the answer, I think, clearly is no. They could not require that the 10 million E&C requirement be dropped. We have cited in our brief not just the logic of it, not just the fact that that parenthetical that says, in the statute, you may amend, revoke, or modify, parentheses, except regarding the clearing agencies. That parenthetical strongly says you may not amend, revoke, or modify. You can't circumvent it. We have cited in our brief Cherokee Nation that says if you try to pass a reg that is inconsistent with the statute, it is void. Could they use 78Q to promulgate an independent rule, a $5 million rule? I don't think so. I don't think that gives them the power to do what they can't do directly, to amend, revoke, or modify an existing rule. Now, they can pass sort of rules that might relate generally, to things that don't contravene existing NFCC rules, but they can't undermine them and undo them. The other point I would like to make is we didn't even get to really the issue in U.S. v. Ackerman about whether if they are permissibly exercising governmental power, are they subject to the Constitution. In this case, the district court and DTC have doubled down on the LeBron test as being the test for state action. But in the midst of this case, the U.S. has changed its position, and I really ask this court to look carefully at that change in their position. No longer do they maintain that LeBron is the only test. I would ask the court to consider that, and consider it in the context of Justice Gorsuch's analysis in Ackerman. It is not that mechanical a kind of analysis. As Justice Gorsuch says, we cannot evade the Constitution, and it's required that we do. We cannot evade the Constitution, and we cannot evade the constitutional requirements simply by deploying a corporate form. And since we hadn't talked about that before, the LeBron issue I think is very important for the court, particularly given the government's change in position, and the fact that the district court here relied completely on the idea that LeBron is the only test that would apply.